UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JEROME WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 3:20CV849-PPS/MGG |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner | ) |
| of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Jerome White has been awarded supplemental security income benefits as of September 27, 2019, the day after he turned 55 and entered the "advanced age" category under the disability regulatory scheme.  White nonetheless appeals the Social Security Administration's final decision denying his application for supplemental security income benefits dating back to April 22, 2015.  That denial is the written decision of an Administrative Law Judge, entered after a hearing at which White appeared and testified.[1]  [AR 16-25; AR 31-74.]  The ALJ found that White has four severe impairments: unspecified demyelinating disease, right hand tremor, mild degenerative disc disease of the cervical spine, and obesity.  [AR 18.]  The ALJ first concluded that White's severe impairments do not conclusively establish disability by meeting or medically equaling the severity of any listed impairments. [AR 19.]  The ALJ then found that, prior to September 27, 2019, considering White's age, education, work experience and residual functional capacity to

---

[1] The administrative record [AR] is found in the court record at docket entry 14, and consists of 1002 pages.  I will cite to its pages according to the Social Security Administration's Bates stamp numbers rather than the court's Electronic Case Filing page number.

perform light work with certain limitations, there were jobs White could perform in significant numbers in the national economy, and that White was not disabled. [AR 23.] But as of September 27, 2019, White's disability determination required consideration of "transferable skills," of which the vocation expert testified he had none. [*Id*.] The impact of this change in analysis was that the ALJ found that White became disabled as of September 27, 2019, and continued to be disabled thereafter through the date of her decision. [AR 25.] White asks me to reverse the ALJ's decision that he was not disabled prior to September 27, 2019, or remand the case for further proceedings by the Social Security Administration.

My role is not to determine from scratch whether or not White is disabled and entitled to benefits. Instead, my review of the ALJ's findings is deferential, to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence. *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923,926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The role of the courts is "extremely limited," and I am "not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In other words, I can't reweigh the evidence or substitute my judgment for that of the ALJ. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). But these standards do not mean that I "will simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The ALJ must show her work by building an "accurate and logical bridge" between the evidence and her conclusions. *Varga v. Colvin*,

2

794 F.3d 809, 813 (7th Cir. 2015); *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). A failure to do so requires reversal. *Id.*

White offers a number of arguments challenging the non-disability portion of the ALJ's decision. I find none of White's arguments to be persuasive. So, for reasons set out below, I will affirm the judgment of the ALJ.

## The ALJ's Approach to the Evidence

White contends that the ALJ "mischaracterized evidence and impermissibly cherry-picked facts that supported her finding of non-disability and ignored evidence that pointed to a disability finding." [DE 18 at 10.] As White acknowledges, however, an ALJ is "not required to discuss every piece of evidence in the record." *Parker for D.R.S. v. Berryhill*, 721 Fed.Appx. 519, 522 (7th Cir. 2018); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). But cherry-picking is a two way street. A claimant can't succeed by pointing only to the evidence that supports his claims and ignoring evidence of only mild impairment or improved function. *Jason G. v. Kijakazi*, No. 1:20cv486, 2022 WL 500416, at *9 (N.D.Ind. Feb. 18, 2022) (Lee, J.).

White argues that the ALJ ignored "the most pertinent finding" of his January 16, 2018 MRI, namely the "significant white matter changes which were indicative of a demyelinating disease." [DE 18 at 10.] This is an inaccurate critique of the ALJ's decision, which expressly notes that the January 2018 MRI "showed evidence of a signal abnormality that suggested demyelination." [AR 21.] White may be conflating the January 2018 MRI of the cervical spine with the March 2018 MRI of the brain, which showed "[e]xtensive white matter disease...[v]ery suspicious for demyelination such as multiple sclerosis." [AR 471.]

3

The ALJ did not overlook that test result either, though, and expressly referred to it when reviewing the medical record. [AR 21.]

White suggests that the ALJ misconstrued the findings of neurologist Dr. Richard Strawsburg during White's February 2018 exam. [DE 18 at 10.] White confuses the office notes of White's visit to Dr. Strawsburg on February 13, 2018 [AR 456-459] with those of the May 8, 2018 visit [AR 453-456]. [DE 18 at 10.] In any event, the ALJ's recap of White's treatment with Dr. Strawsburg accurately captures the finding of a tremor in White's right hand with grip but not at rest, and Dr. Strawsburg's exploration of a demyelinating disease. [AR 21.] White fails to demonstrate that the ALJ significantly mischaracterized White's condition during treatment by Dr. Strawsburg, or how his preferred interpretation of the treatment notes would impact the ALJ's overall determination of his residual functional capacity.

White objects to the ALJ's conclusion that his tremor and grip strength improved with therapy. [DE 18 at 11.] Dr. Strawsburg's record of White's visit on May 8, 2018 reflects White's report that his right hand and arm were stronger after occupational therapy but that White saw little change in functioning. [DE 451, 454-55, 459.] To use his own charge against him, White cherry-picks details from the occupational therapist's report, but overlooks its overall conclusions that, although White's right hand remained weak, his hand strength had improved, his grasp had increased from 37.6 pounds of pressure to 42, and that he displayed improved ability to manipulate small objects. [AR 351.] White demonstrates no inaccuracy in the ALJ's review of the record on the impact of therapy and

4

medication on White's difficulties with his hand.  More importantly, White does not establish how the ALJ's RFC – which included limits on handling, fingering and feeling with the right hand, and a limitation to jobs with minimal writing requirements – was not reasonably supported by the record.

What's more, the ALJ did not make an erroneous conclusion that White had "100% functioning" of his right hand, as White suggests.  [DE 18 at 11.]  Instead, the ALJ came to a conclusion about the severity of limitations of the hand's function, demonstrating that she was aware of and weighed both the positive and negative evidence, which I cannot reweigh.

White makes a passing reference to his testimony that "his balance was off due to MS." [DE 18 at 12.]  No error in the ALJ's treatment of this issue is shown.  The ALJ repeatedly acknowledged the evidence of a demyelinating condition, although no doctor has diagnosed White with MS.  [AR 21, 22.]  The decision accurately reflects the instances in which physicians found that White's gait displayed no ataxia. [AR 21, 22.]  Nonetheless, the RFC contains exclusions for climbing ladders, ropes or scaffolds and exposure to hazards including unprotected heights.  On the whole, the ALJ's decision displays an even-handed approach to the record and a fair evaluation of the evidence overall.

## Analysis of Physicians' Opinions

The ALJ's consideration of physician opinion evidence is the next issue that White challenges. Before the Commissioner, White relied on a statement from Dr. Strawsburg including this language:

5

> "I do believe that he would have difficulty working a long day due to his weakness of grasp on the right side...His tremor also interferes with operation of the hand.  Because of that I am not certain that he would be able to work more than a limited number of hours per day doing any kind of work involving strength or movement of the upper extremities."

[AR 985.]  The ALJ's analysis of Dr. Strawsburg's statement is minimal:  "The undersigned does not find the opinion of Dr. Strawsburg to be persuasive, as it is vague as to what is meant by a [sic] limited hours of the day."  [AR 23.]  Admittedly, this is not the most detailed or insightful explanation.

On the other hand, Dr. Strawsburg's opinion is somewhat qualified.  "Difficulty working a long day" is not the same as unable to work with his hands at all.  Dr. Strawsburg is merely "not certain" that White could work "more than a limited number of hours."  The ALJ did in fact make an RFC finding limiting the use of White's right hand to "frequently," which means from one-third to two-thirds of the time.  SSR 83-10: Titles II and XVI: Determining Capability to Do Other Work – The Medical-Vocational Rules of Appendix 2.  The RFC also excludes work requiring "more than minimal" writing.  [AR 19.]  So, despite the ALJ's dismissive comment about Dr. Strawsburg's opinion, she determined an RFC with limitations on White's use of his right hand that are consistent with Dr. Strawsburg's statement.  White therefore does not demonstrate a reversible error in the ALJ's treatment of Dr. Strawsburg's somewhat diluted opinion.

Dr. Gupta was a consultative examiner for White's disability claim.  White finds fault with the ALJ's treatment of Dr. Gupta's opinion as well.  Unfortunately, White's brief purportedly quotes Dr. Gupta but without a citation to where the opinion can be found within the 1002-page administrative record.  [DE 18 at 15.]  According to White, Dr. Gupta

6

found that White "is unable to do any lifting, carrying, or handling of objects due to pain and stiffness in the right wrist." [*Id*.] The ALJ said she did not find persuasive Dr. Gupta's "opinion regarding the right upper extremity, as it is somewhat consistent with and supported by the record." [AR 22-23.] The ALJ went on: "The undersigned notes that the claimant had increased strength following therapy and that his tremors have improved with the medication." [AR 23.]

White's application for benefits was filed on May 15, 2018, after new regulations changed how an ALJ must evaluate medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 416.920c, applicable to applications filed on or after March 27, 2017. Under the new revisions, treating medical sources are not given special weight, and the ALJ is to determine the persuasiveness of any medical opinion using five considerations – supportability, consistency, relationship with the claimant, specialization and any other factors. 20 C.F.R. §416.920c(a)-(c) (2017). Of these, consistency and supportability are the most important factors. §416.920c(b)(2) (2017).

The ALJ's language is confusing when it indicates that Dr. Gupta's opinion was not persuasive because it was "somewhat consistent with and supported by the record." [AR 23.] White construes this as a near-total dismissal of the opinion. [DE 18 at 15.] By contrast, the Commissioner interprets the decision as indicating that the ALJ found Dr. Gupta's opinion "*only somewhat* consistent with and supported by the other evidence of record." [DE 22 at 14 (emphasis added).] The latter seems to me the more reasonable

7

interpretation, particularly as the ALJ did ultimately recognize in White's RFC limitations on the use of his right hand. The reasons that the ALJ discounted Dr. Gupta's categorical opinion appear to be expressed in her next sentence, in which she notes again the record evidence of some improvement in White's symptoms after therapy and with the right medication. [AR 23.] This expresses a conclusion about the consistency and supportability of Dr. Gupta's opinion, a basis for the ALJ's conclusions that is entirely consonant with the governing regulations.

White is wrong to suggest that the ALJ "did not consider Dr. Gupta's own physical exam" of White. [DE 18 at 15.] The ALJ did not ignore, but had earlier noted Dr. Gupta's September 7, 2017 findings as to the limited grip strength of White's right hand, but normal fine finger manipulation [AR 20, 622] and his September 6, 2018 finding of poor fine finger manipulative abilities with the right hand. [AR 21, 495]. As has already been made clear, the ALJ fully recognized that White suffered from functional limitations with his right hand. Her task was to determine how extensive those limitations were, and their impact on White's functional capacity, based on a medical record that contained conflicting indications. White has not demonstrated the ALJ failed to give appropriate consideration to the opinions of Dr. Strawsburg or Dr. Gupta, in light of the evidence as a whole.

### Reopening of White's Prior Benefits Application

White had previously applied for supplemental security benefits on June 9, 2017. [AR 16.] That claim was denied on September 11 of that year. [*Id*.] The ALJ noted that 20 C.F.R. §416.1488 allows a claim to be reopened for any reason within 12 months of an initial determination. [*Id.*] Despite the fact that White's new application was filed on May 15,

8

2018, within 12 months of the prior denial, the ALJ applied a "good cause" standard and denied reopening. [*Id*.] This denial meant that the decision on White's disability would "only consider the period beginning May 15, 2018, the date of the current application." [*Id*.] White now asserts that because the current application was made within 12 months of the September 11, 2017 denial, the ALJ was not required to find good cause for reopening. [DE 18 at 17.]

Recognizing that "the district court does not have subject matter jurisdiction under §405(g) to review whether the ALJ improperly refused to [re]open," White invokes mandamus jurisdiction under 28 U.S.C. §1361. [DE 18 at 18.] Ultimately, however, White asks only that if his claim is remanded, the court compel the Commission to reopen his June 2017 application. [*Id*. at 19.] The Commissioner vigorously resists the suggestion that mandamus relief is available in this context. [DE 22 at 20-21.] Because I am not persuaded to remand White's case for further consideration by the Commissioner, I will not wade into the parties' dispute about whether I can or should order the ALJ to apply the correct standard when considering White's request for reopening.

**SSR 83-14: Appropriate use of The Medical-Vocational Guidelines as a Framework**

Within the federal regulations governing the Commissioner's consideration of disability applications are the Medical-Vocational Guidelines, also known as "The Grids." These tables provide a guide to a decision of disabled or not disabled based on a claimant's RFC and other factors including a claimant's age, education, previous work experience and the transferability of skills. However, where a claimant has both non-exertional and

9

exertional limitations, SSR 83-14 provides that the Grids are not applicable to direct the disability conclusion, and instead are merely a "framework for decisionmaking." One example of a nonexertional function in SSR 83-14 is "using the fingers and finger tips to work with small objects." White's hand tremor is a nonexertional limitation. The environmental restrictions of White's RFC (eliminating exposure to hazards including moving mechanical parts or unprotected heights) relate to another nonexertional limitation, namely White's occasional balance issues.

SSR 83-14 observes that "[a]fter it has been decided that an impaired person can meet the primary strength requirements of sedentary, light or medium work…a further decision may be required as to how much of the potential occupational base remains, considering certain nonexertional limitations which the person may also have." In this instance, as contemplated by SSR 83-14, rather than rely on a mechanical application of the Grid, the ALJ used the resource of a vocational expert to assist in determining the effect of White's limitations, both exertional and nonexertional, on the range of work that White can perform within the "light work" classification.

For a hypothetical individual with the RFC the ALJ found for White, the vocational expert identified three jobs that exist in the national economy that the person could perform. [AR 64.] These totaled more than 130,000 jobs. [*Id*.] White argues that reversal or remand is warranted because the ALJ failed to obtain testimony from the vocational expert on the "erosion of the occupational base" available to White in view of all of his limitations. [DE 18 at 21.] White contends that the vocational expert's testimony as to White's ability to

perform three particular sorts of jobs "provides no information about the number of jobs that are eliminated from the occupational base because of the nonexertional limitations." [*Id*.]  White interprets SSR 83-14 as requiring a more elaborate assessment of how many jobs in the light unskilled job base White is incapable of due to his nonexertional limitations, and then if that reduction of the job base is significant enough, application of the Grids for the *sedentary* occupational base instead, yielding (because White was over age 50) a finding that White was disabled.  [DE 18 at 20-22.]

I frankly do not follow White's logic.  The language of SSR 83-14 that White relies on does not, in my view, mandate this analysis:  "Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."   The reference to "the remaining portion of the job base" would seem to mean the jobs remaining in the otherwise applicable exertional category, not the next lowest exertional category, as White would have it.  White cites no cases or other authority supporting his interpretation.  The record here, particularly the vocational expert's testimony that White could perform jobs of which more than 130,000 positions exist, is not shown to make it "clear" that White's limitations have "significantly eroded the exertional job base," within the meaning of  SSR 83-14.  White does not persuade me that the ALJ failed the Commissioner's burden to establish that a significant number of jobs exist in the national economy that the claimant can perform.

### Geographic Incidence of Existing Jobs

White's final challenge is that the ALJ's conclusion that White was capable of "work that existed in significant numbers in the national economy" fails to meet the requirement of

SSR 83-12 to include "a statement of the incidence of such work in the region in which the individual resides or in several regions of the country." [DE 18 at 23.] The statutory and regulatory authority White cites proves the failure of the argument, because those authorities establish that the phrase "in the national economy" is understood to mean either in the region where the claimant lives or in several regions of the country. For example, as White himself observes [DE 18 at 24], the governing statute, 42 U.S.C. §423(d)(2)(A), "defines" the phrase:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.*

(Emphasis added.) Regulatory language uses a similar definition of the phrase: "We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." 20 C.F.R. §416.966(a).

Given the establishment of an understood meaning for the phrase "in the national economy" in applicable statutory and regulatory language, the failure to use the more detailed definitional language does not present a basis for reversal. Rejecting a similar argument, the Seventh Circuit recently cited §423(d)(2)(A) when it held that there was "no reason to believe that the VE was not using that statutory definition of 'in the national

12

economy' when testifying as to jobs available nationwide." *Butler v. Kijakazi*, 4 F.4th 498,504 (7th Cir. 2021). In his reply, White has abandoned the argument, perhaps in recognition of its defeat in the *Butler* decision.

## Conclusion

In reviewing the ALJ's decision, I "may not decide facts anew or make independent credibility determinations, and must affirm the ALJ's decision even if reasonable minds could differ about the ultimate disability finding." *Brown*, 845 F.3d at 251. I find that substantial evidence supports the ALJ's determination that White was not disabled prior to September 27, and that the ALJ's decision "build[s] an accurate and logical bridge between the evidence and the result." *Beardsley*, 758 F.3d at 837.

**ACCORDINGLY:**

The final decision of the Commissioner of Social Security denying plaintiff Jerome White's application for social security disability benefits is AFFIRMED. The Clerk shall enter judgment in favor of defendant Commissioner and against plaintiff.

**SO ORDERED**.

ENTERED: March 11, 2022

/s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**